UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GIC SERVICES, LLC                                    CIV. A. 13-6781

VERSUS                                               SECTION "C"

FREIGHTPLUS (USA), INC.                              HON. HELEN BERRIGAN

## OPINION

This case concerns the shipment of a tugboat to Warri, Nigeria rather than Lagos, the destination intended by its shipper. The Court held a bench trial on May 11 and May 12, 2015.[1] Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, the Court now enters the following findings of facts and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[2]

## I.       FINDINGS OF FACT

The plaintiff, GIC Services, LLC ("GIC"), is a limited liability company located in Houston, Texas that procures equipment on behalf of its parent company, GIC Oil and Gas Services, Ltd. ("GIC Oil and Gas"). GIC Oil and Gas is based in Nigeria and specializes in waste management and road construction. Sogie Ebolo is the managing director of GIC as well as one of the directors of GIC Oil and Gas and testified on GIC's behalf at trial. She has previously

---

[1] (Rec. Docs. 181, 182.)
[2] To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

shipped over fifteen pieces of heavy equipment, including cranes, a truck, generators, compressors, and other pieces of heavy equipment to Lagos.

Freightplus (USA), Inc. ("Freightplus") operates as a "middleman" in the shipping industry, connecting shippers to ocean carriers. At trial, Lisa Keel, Freightplus's vice president, testified that Freightplus receives inquiries from shippers looking to move cargo and locates a vessel and secures a freight rate on behalf of the shipper. Freightplus has filed a surety bond with the Federal Maritime Commission as a non-vessel operating common carrier (NVOCC) and maintained a license to operate as a freight forwarder and an NVOCC at the time of the events at issue.[3]

Industrial Maritime Carriers, L.L.C. ("IMC") is a vessel owner and operator. It does not employ its own staff. Instead, it engages agent companies such as Intermarine, LLC ("Intermarine"), whose staff run its day-to-day operations.

On or about December 15, 2012, GIC contacted Freightplus over the phone on or about December 15, 2012 to inquire about rates for shipping the M/V REBEL ("REBEL"), a tugboat, to Lagos, Nigeria. Lisa Keel, acting on behalf of Freightplus, approached several carriers to solicit quotes for the shipment, including the carrier Yacht Path.[4] After negotiation, GIC and Freightplus agreed to a rate of $111,000.[5] Ms. Ebolo testified that prior to reaching this agreement with Freightplus, she also solicited a quote from the company Africa 2000 for $68,000. However, she ultimately selected Freightplus because Freightplus could ship the REBEL to Lagos by mid-January to be used in service of a contract that GIC Oil and Gas had

---

[3] (Ex. 81, Ex. 82.)
[4] (Ex. 82.)
[5] (Ex. 84.)

secured, whereas Africa 2000 could not guarantee a mid-January arrival date. GIC subsequently paid Freightplus the agreed upon rate in full.

Meanwhile, after being contacted by Freightplus, Yacht Path contacted Intermarine, the agent for IMC. Intermarine agreed to ship the REBEL aboard IMC's vessel, the M/V INDUSTRIAL DESTINY ("INDUSTRIAL DESTINY"). On December 20, Yacht Path sent Freightplus an invoice for the shipment of the REBEL showing Lagos as the tugboat's destination.[6] On the same day, unbeknownst to GIC or Freightplus, IMC generated a carrier booking note showing Warri, not Lagos, as the destination port.[7]

Despite this discrepancy in IMC's booking note, documents exchanged between Yacht Path, Freightplus, and GIC continued to show Lagos as the REBEL's destination. On December 21, Gail Ryan, an employee of Yacht Path, emailed Ms. Keel of Freightplus a draft bill of lading showing Lagos as the port of discharge.[8] Freightplus also sent forwarding instructions to Yacht Path on December 21, again showing Lagos as the REBEL's destination.[9]

On December 26, Freightplus issued three copies of a "House Bill of Lading" marked "original" ("Freightplus bill of lading"). The Freightplus bill of lading represented that the REBEL had been shipped on board the INDUSTRIAL DESTINY from Houston, Texas on December 26, that the REBEL's destination was Lagos, and that freight had been prepaid. The bill of lading was issued "clean", meaning that no damage was noted on the REBEL at the time of loading.[10]

---

[6] (Ex. 89.)
[7] (Ex. 92.)
[8] (Ex. 6.)
[9] (Ex. 85.)
[10] (Ex. 86.)

Contrary to the Freightplus bill of lading's representations, the INDUSTRIAL DESTINY actually sailed a day later on December 27.[11] On that day, IMC issued its own bill of lading ("IMC bill of lading"). The bill was marked as "not negotiable", and therefore could not have been used to claim the cargo at its destination. Unlike the Freightplus bill of lading, the IMC bill of lading listed Warri as the port of discharge and was not "clean", instead noting that the REBEL showed scratches, rusting, dents, and paint deterioration. Finally, the IMC bill of lading represented that freight had been prepaid and that the REBEL had been loaded on board on December 27.[12] In addition to the bill of lading, IMC generated a manifest that listed Warri as the port of discharge.[13]

While the INDUSTRIAL DESTINY was en route to Nigeria, correspondence between the vessel, Intermarine, and Yacht Path shows that there was confusion over the REBEL's final destination. Between January 2 and January 3, 2013, Kyle Branting, an employee of Intermarine, emailed Kevin Cummings of Yacht Path whether Intermarine had the option of discharging the REBEL as well as a second tugboat aboard the INDUSTRIAL DESTINY in either Lagos or Warri. Mr. Cummings confirmed that the "small boat", referring to the REBEL, desired a Lagos discharge. Mr. Branting replied, "Have to pump the breaks a little, getting some incentive to discharge in Warri."[14] At trial, Mr. Branting testified that he did not recall what the "incentive" for discharging in Warri referred to. On January 4, Berend Bosman, an employee of Supermaritime acting as the vessel agent and responsible for handling cargo clearance[15], emailed the captain of the INDUSTRIAL DESTINY stating that he had been under the mistaken impression that Warri would be the INDUSTRIAL DESTINY's "first and only port in

---

[11] (Ex. 17, Ex. 94.)
[12] (Ex. 93.)
[13] (Ex. 94.)
[14] (Ex. 19.)
[15] (Ex. 32.)

Nigeria."[16] On January 9, Mr. Cummings of Yacht Path clarified in an email to Cedric Chauvet and Mr. Branting of Intermarine that the REBEL was to discharge at Lagos. However, Mr. Chauvet subsequently replied that Warri was "where both boats will be discharged" and asked that "data" be shared with Mr. Cummings on this point.[17] On January 10, Mr. Cummings sent an email to Mr. Chauvet, Mr. Branting, Mr. Bosman, and others, once again stating that both boats would be discharged at Lagos.[18]

In spite of these indications of a discrepancy in the final destination, no one at Yacht Path, Intermarine, or aboard the Industrial Destiny took steps to rectify the mistake. On the morning of January 10, Mr. Cummings emailed Ms. Keel of Freightplus to provide the contact information for Berend Bosman, who Mr. Cummings explained was the vessel agent and also would "handle the cargo clearing process," which he pointed out "can be a hassle." Mr. Cummings wrote:

> I suggest the that [sic] you have the client contact the agent and start the process of collecting the cost for local charges and have them paid ASAP so the boat can be collected as soon as its discharged.
>
> Please advise me when the receiver [GIC has made contact with the agent so I know the link has been established.
>
> The current ETA of the vessel to Lagos is Jan 17th.[19]

Despite Mr. Cummings's recommendation that she notify GIC to contact Mr. Bosman to arrange payment "ASAP", Ms. Keel did not forward Mr. Bosman's contact information to GIC upon receiving Mr. Cummings's email. Ms. Ebolo also testified, and the Court finds credible, that Freightplus did not at this time or earlier inform GIC of the need to complete any pre-clearance procedures.

---

[16] (Ex. 26.)
[17] (Ex. 29.)
[18] (Ex. 31.)
[19] (Ex. 32.)

Beginning on the morning of January 15, Ms. Ebolo emailed Ms. Keel three times to provide the contact information for GIC's clearing agent, Patricia Ugwunnah, ask for the vessel agent's contact information, and inquire about next steps.[20] At 9:03 a.m. on January 16, Ms. Keel replied to Ms. Ebolo sharing the contact information for Mr. Bosman, the INDUSTRIAL DESTINY's vessel agent which Mr. Cummings had provided her six days earlier. Ms. Keel further stated, "We have given them The [sic] name of your clearing agent. It can't change."[21][22] Although informing GIC that its clearing agent could not change, at 3:36 p.m., Ms. Keel changed the details of the vessel agent, emailing Ms. Ebolo that the new agent was Desmond Balendra.[23]

At 10:46 p.m. on January 16, Mr. Cummings emailed Mr. Balendra, the vessel agent for the INDUSTRIAL DESTINY and an employee of MGM Logistic Solutions Services Ltd. ("MGM"), explaining that there was a "small tug boat" in the INDUSTRIAL DESTINY that was manifested to Warri, and that "There was some confusion during the booking of this boat and it needs to be discharged in Lagos." This email, coming the night before the REBEL was to arrive at Lagos, was the first time anyone at Yacht Path or IMC discussed the need for changing the REBEL's destination. Mr. Cummings asked Mr. Balendra to contact the receiver (Patricia Ugwunnah) and asked, "Can you advise if it is possible to discharge the tug and hold in custody at the terminal as you have done for our past shipments in Port Harcourt. The receiver can then

---

[20] (Ex. 38, 39, 45.)

[21] (Ex. 40.)

[22] The Court notes that many of the emails cited to in this opinion do not note time zone differences. When pertinent, the Court assumes that the time stamps associated with the emails cited to are based on the time zone of the email account from which the email string is provided. As the email strings discussed in this paragraph are from Ms. Keel's account, the Court assumes that the time stamps represent Eastern Standard Time.

[23] (Ex. 42.)

complete payments for local charges and also for customs clearance." Mr. Cummings also stated, "I would be very grateful if you can help my desperate situation."[24]

Despite Mr. Cummings' imploring, the vessel agent informed him that a last minute change of destination was not possible. At 4:44 a.m. on January 17, Ikechukwu Isang, an employee of MGM, replied that they would not be able to discharge the REBEL in Lagos "as the information is coming way too late." Mr. Isang added, "Moreover, we did not get any such instruction from Intermarine."[25]

However, Mr. Cummings did not share this information with Freightplus. Instead, he contacted Ms. Keel and represented that delivery was compromised because the clearing agent was unavailable and various port charges had not been paid.[26] A few minutes later, at 12:21 p.m., Ms. Keel wrote to Ms. Ebolo, urging her to have GIC's agent contact the vessel agent and to provide an alternate phone number for GIC's agent. At 3:31 p.m., Ms. Ebolo replied to Ms. Keel with a different phone number for GIC's clearing agent.[27] Ms. Keel forwarded the number to Mr. Cummings, who replied that he was not able to reach the agent at the new number.[28]

At 4:14p.m., Mr. Cummings wrote to Moses Oyekunie at MGM, explaining that the REBEL had been manifested for discharge at Warri "by mistake" and imploring, "Can you advise if you can make a miracle for me and arrange with local authorities to allow the discharge of the tug and keep in the custody of the terminal???" He stated, "I can get Intermarine to agree with this and authorize but I need to know if it is possible before I approach them." He explained that he had been able to perform such an arrangement in Port Harcourt, another port in Nigeria,

---

[24] (Ex. 53.)
[25] (Ex. 53.)
[26] (Ex. 44.)
[27] (Ex. 47.)
[28] (Ex. 48.)

on past shipments.[29] However, MGM informed him that local authorities confirmed that the REBEL could not be discharged in Lagos.[30] At 4:54 p.m., Mr. Cummings asked Ms. Keel for an email address for GIC's agent, stating "Everyone is in a panic over this and noboy [sic] answers the phone at this hour in Nigeria."[31] Ms. Keel obtained the email address from Ms. Ebolo and sent it to Mr. Cummings at 5:43 p.m.[32]

The next morning, Mr. Cummings informed Ms. Keel over email, "I cannot reach anyone in Nigeria and nobody has called our agents from the receivers [sic] side. The ship was unable to discharge the tug in Lagos without completing formalities. The ship is now underway to Warri…"[33]

Thereafter, both Mr. Cummings and Ms. Keel claimed that the REBEL could not be discharged at Lagos because GIC's agent, Ms. Ugwunnah, did not timely contact the vessel agent and could not be reached on the phone.[34] However, the email exchanges between Yacht Path and the vessel agent indicate otherwise. On January 18, Mr. Balendra of MGM wrote:

> Sorry was on sick leave over the last 2 days. In the meantime you can be assured that my colleagues copied herewith would have assisted if there was a possibility to discharge the boat in Lagos, *but considering the manifest and customs documents showing otherwise (Port of discharge as Warri)* it was not possible for them to achieve so.[35] (Emphasis added.)

The REBEL was discharged upon the INDUSTRIAL DESTINY's arrival at Warri. Although Yacht Path initially offered to cover reasonable costs to transport the REBEL back to Lagos, Mr. Cummings did not accept GIC's quote for the cost of transport, and these negotiations apparently

---

[29] (Ex. 54.)
[30] (Ex. 54.)
[31] (Ex. 49.)
[32] (Ex. 50.)
[33] (Ex. 55.)
[34] (Ex. 56, Ex. 60, Ex. 65.)
[35] (Ex. 54.)

broke down.[36] Thereafter, GIC made several attempts to secure the release of the REBEL. However, in late September 2013, after GIC had paid the necessary fees to the port authority and customs, it was informed for the first time that that the REBEL would not be released because the freight had never been paid to IMC.[37] Indeed, although GIC paid Freightplus the full amount for freight, this payment was never remitted to IMC.

## II.     PROCEDURAL HISTORY

On March 1, 2013, GIC initiated this action against Freightplus seeking damages for the delivery of the REBEL to Warri, Nigeria.[38] Freightplus subsequently filed a third-party complaint against IMC, claiming that IMC was liable under Federal Rule of Civil Procedure 14(a) for any losses or damages sustained by GIC due to IMC's default, negligence, carelessness, or omissions and, in the alternative, under Federal Rule of Civil Procedure 14(c).[39] On May 12, 2014, Freightplus amended its third-party complaint to bring a claim under Fed. R. Civ. P. 14(a) only.[40]

On May 27, 2014, IMC answered GIC's Second Amended Third-Party Complaint and asserted a counterclaim against Freightplus and the REBEL.[41] IMC claims that it is entitled to assert a maritime lien against Freightplus, *in personam*, and the REBEL, *in rem*, for unpaid freight charges for the carriage of the REBEL aboard the INDUSTRIAL DESTINY.[42]

---

[36] (Ex. 65.)
[37] (Ex. 103. Ex. 79.)
[38] (Rec. Doc. 1.)
[39] (Rec. Doc. 60.)
[40] (Rec. Doc. 92.)
[41] (Rec. Doc. 93.)
[42] (*Id*.)

On February 12, 2014, the Court denied motions for summary judgment filed by Freightplus and IMC.[43] A bench trial commenced on May 11, 2015 and ended on May 12, 2015.[44]

### III.   CLAIMS & DEFENSES

GIC argues that defendant, Freightplus, is liable to it for the delivery of the REBEL to Warri and for intentionally making false representations to GIC regarding the REBEL's shipment. In addition to liability for damages to GIC itself, GIC argues that Freightplus should also compensate for the lost profits sustained by GIC's parent company, GIC Oil and Gas, Ltd.[45]

Freightplus responds that it did not cause GIC's losses and that because this action falls under the coverage of the Carriage of Goods by Sea Act ("COGSA"), Freightplus's liability would in any event be limited to $500.[46] Freightplus further asserts that GIC failed to mitigate its damages.[47] Finally, Freightplus asserts that if it is found liable to GIC, then it is entitled to indemnity from IMC.[48]

IMC has counterclaimed against Freightplus and the REBEL, *in rem*, for the unpaid freight charges.[49] GIC answers that it has paid all charges for the transport of the REBEL, that any losses were caused by Freightplus, and that GIC and the REBEL are not in privity with IMC

---

[43] (Rec. Doc. 146.)
[44] (Rec. Docs. 181, 182.)
[45] (Rec. Doc. 160.)
[46] (Rec. Doc. 6 at 5; Rec. Doc. 177 at 29.)
[47] (*Id.*)
[48] (Rec. Doc. 93.)
[49] (Rec. Doc. 177 at 17.)

and thus not liable to IMC.[50] Freightplus likewise avers that it is not in privity with IMC and that IMC is at fault for its own losses.[51]

## IV.    CONCLUSIONS OF LAW

### A.  Jurisdiction

The Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §1333. Venue is proper in this district.

### B.  GIC's claims against Freightplus

The Court finds that COGSA governs the relationship between GIC and Freightplus. COGSA provides that it "shall apply to all contracts for carriage of goods by sea to or from ports of the United States in foreign trade."[52] COGSA defines the term "contracts for carriage" as those "covered by a bill of lading or any similar document of title."[53] These requirements are clearly met. GIC and Freightplus contracted for the REBEL to be carried from Houston to Nigeria.[54] Their contract was covered by a bill of lading issued by Freightplus.[55] Thus, COGSA applies to the transaction at issue.

### 1.  *Limitation of liability*

---

[50] (Rec. Doc. 97 at 5.)
[51] (Rec. Doc. 95 at 5.)
[52] (COGSA § 13 (previously codified at 46 U.S.C. app. § 1312).)
[53] (COGSA § 1(b) (previously codified at 46 U.S.C. app. § 1301(b)).)
[54] CITE.
[55] CITE.

COGSA limits the liability of carriers to $500 per package except by agreement between the carrier and shipper.[56] However, COGSA provides that an *unreasonable deviation* from the contract of carriage will result in the carrier being held liable for loss or damage, notwithstanding the limitation of liability. 46 U.S.C. app. §1304(4). The definition of deviation frequently referenced by courts sets forth that a deviation includes "failure to deliver the goods at the port named in the bill of lading and carrying them farther to another port."[57]

The delivery of the REBEL to Warri clearly constitutes a deviation, as Freightplus failed to deliver the REBEL to Lagos, the discharge port named in the Freightplus bill of lading, and instead carried the REBEL farther to the port of Warri. Thus, the Court must determine whether the deviation was reasonable. Reasonableness in this context is strictly construed, and the burden of proof rests on the carrier to show that its actions were reasonable.[58] The reasonableness of a deviation depends on an assessment of all the surrounding circumstances. [59]

The Fifth Circuit has held that "a shipper can make out a case of unreasonable deviation simply by proving that his cargo was offloaded at a place other than the stipulated destination." [60]The Court finds that plaintiff has made out a prima facie case that Freightplus committed an unreasonable deviation under COGSA.

Moreover, the surrounding circumstances indicate that the deviation was unreasonable. Freightplus blames the REBEL's misdelivery on the fact that GIC's clearing agent did not complete clearance formalities and pay for applicable port charges prior to when the REBEL

---

[56] COGSA §4(5), previously codified as 46 U.S.C App. §1304(5).
[57] *Spartus Corp. v. S/S Yafo*, 590 F.2d 1310, 1313 (5th Cir. 1979).
[58] *Ross Indus. V. M/V/ Gretke Oldendorff*, 483 F.Supp. 195, 199 (E.D. Tex. 1980).
[59] *General Elec. Co. Intern. Sales Div. v. S.S. Nancy Lukes*, 706 F.2d 80 (2d Cir. 1983).
[60]  *S/S YAFO*, 590 F.2d at 1314 (5th Cir. 1979); *Lykes Lines Ltd. V. M/V BBC Sealand*, 398 F.3d 319, 326-27 (5th Cir. 2005).

should have been discharged at Lagos.[61] However, the Court finds this explanation unconvincing. The correspondence between Yacht Path, Intermarine, and the INDUSTRIAL DESTINY's vessel agent directly contradict Freightplus's version of events. When asked on January 16 whether it would be possible to discharge the REBEL at Lagos even though it was manifested to Warri, Mr. Isang, an employee of MGM, replied that the discharge would not be possible because the "information is coming too late" and they had not received any such instructions from Intermarine, IMC's agent.[62] Furthermore, MGM clearly indicated in an email shortly after the INDUSTRIAL DESTINY's departure from Lagos that there was no possibility for the boat to be discharged at Lagos "considering the manifest and customs documents showing otherwise Port of discharge as Warri."[63] These exchanges demonstrate that the REBEL could not be discharged at Lagos because the vessel's manifest and customs documentation indicated the port of discharge as Warri, not because of a failure on GIC's part to pay port and customs charges or complete other pre-clearing formalities.

Freightplus also blames the misdelivery on the unavailability of GIC's clearing agent during the day prior to the ship's arrival in Lagos. At trial, Ms. Keel testified that GIC's agent, Patricia Ugwunnah, needed to make contact with the vessel agent and did not. However, the email correspondence shows that Freightplus unreasonably delayed providing the vessel agent's contact information to GIC, giving GIC an unrealistically narrow window of time in which to contact the vessel agent. Despite receiving the contact information for the INDUSTRIAL DESTINY's vessel agent on January 10 and an admonishment from Mr. Cummings that she should provide this information to GIC "ASAP," Ms. Keel did not provide GIC with the contact

---

[61] (Rec. Doc. 177 at 12.)
[62] (Ex. 53.)
[63] (Ex. 54.)

information for the vessel agent until roughly 9 a.m. EST on January 16—about 2:00 p.m. in Lagos.[64] Moreover, the vessel agent was changed on January 16, and Ms. Keel notified GIC of the change at 3:36 p.m. EST, or 8:36 p.m. in Lagos.[65] Ms. Ebolo testified at trial that the Port of Lagos closes at 6:00 p.m., at which time non-operational agents are no longer present, and no testimony was offered to contradict this assertion. Thus, GIC was not in possession of the correct contact information for the vessel agent until after the port had closed on the night before the REBEL's delivery.

Although GIC did not share the details of its clearing agent until January 15, the Court finds that this delay did not affect the fate of the REBEL because Freightplus delayed sharing the vessel agent's information (which would later be changed) until the afternoon of January 16—just a few hours before the port closed. Furthermore, the correspondence shows that Desmond Balendra, the vessel agent that Intermarine finally designated and which Ms. Keel passed onto GIC, was out sick on January 16 and January 17—the very window of time during which GIC's agent is purported to have been unavailable.[66] In short, even if GIC's agent should have corresponded with the vessel agent and paid charges to the port prior to the INDUSTRIAL DESTINY's arrival, Freightplus left GIC a window of time that began only a few hours prior to the port's closing on January 16 and ended when the vessel embarked for Warri on January 17; and contact would likely have been impossible since the designated vessel agent was "out sick" during that period of time. The Court will not fault GIC for the carriers' failure to appropriately and timely designate a vessel agent. In any event, as discussed above, any efforts that could have taken place between the vessel agent and GIC's agent would ultimately have been fruitless since

---

[64] (Ex. 40.)
[65] (Ex. 42.)
[66] (Ex. 64.)

the port would not have allowed the REBEL's discharge at Lagos when the manifest indicated it was to be discharged at Warri. The Court therefore finds that the delivery of the REBEL to Warri was an unreasonable deviation, and that Freightplus is not entitled to COGSA's limitation of liability.

The limitation of liability is unwarranted for the further reason that Freightplus allowed an erroneous bill of lading to issue. Courts sitting in admiralty have held that the issuance of an erroneous bill of lading precludes a carrier from claiming this protection.[67] At trial, Ms. Keel testified that she allowed for Freightplus's bill of lading to issue on December 26, 2012 based on Mr. Cummings' representation to her that the REBEL had been loaded onto the INDUSTRIAL DESTINY on that day. In reality, and as shown by IMC's bill of lading, the REBEL was loaded on December 27, which was also the day the vessel embarked from Houston. The false issuance of Freightplus's bill of lading is further underscored by the fact that it was issued "clean", while IMC's bill noted several defects on the REBEL.[68] The bill wrongly stated that the port of discharge was Lagos, whereas the REBEL had actually been manifested to Warri.[69] Finally, the bill misrepresented that freight had been prepaid, when in fact the vessel had not been paid freight.[70] Thus, damages against Freightplus will not be limited by COGSA's limitation of liability.

    2. *Freightplus's liability*

---

[67] *See, e.g.*, *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 846 (2d Cir. 1985) ("[W]e have steadfastly adhered to. . . the proposition that the $500 per package limitation of liability may not be invoked by a carrier that has issued an on board bill of lading erroneously representing that goods were loaded aboard its ship, regardless whether or not the carrier acted fraudulently."). *See also, Mitsui Marine Fire & Ins. Co. v. Direct Container Line, Inc.*, 119 F. Supp. 2d 412, 416-17 (S.D.N.Y. 2000) *aff'd sub nom. Mitsui Marine & Fire Ins. Co. v. Direct Container Lines, Inc.*, 21 F. App'x 58 (2d Cir. 2001).

[68] (Ex. 86, Ex. 93.)

[69] (*Id.*)

[70] (*Id.*)

Freightplus is liable to GIC because of its failure to ensure an accurate bill of lading. The doctrine of estoppel applies to bills of lading and holds the carrier liable for false statements in a bill of lading.[71] As discussed above, Freightplus's bill of lading was replete with errors that GIC acted in reliance on, including the assurance that freight was prepaid and that the REBEL would be shipped to Lagos. Thus, Freightplus is liable for the errors caused by the misrepresentations of its bill of lading.

Furthermore, equitable estoppel applies to maritime transactions generally.[72] The doctrine of equitable estoppel requires that:

> he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted.[73]

Freightplus' false assertions in its letter of indemnity to GIC's bank bar it from disclaiming liability for GIC's damages. In the letter, Freightplus represented to GIC and its financers that it had issued an "original House bill of lading" for clearing in Lagos. Responding to concerns from GIC's bank that there might be a discrepancy between Freightplus's bill and a bill that could be issued by the vessel itself, the letter claims that the "ocean bill" and "house bill" of lading are the same document and that no other document other than Freightplus's bill of lading would be issued by either Freightplus or the vessel. Freightplus stated, "Freightplus has sent you the only OBLs [original bills of lading] to be issued against this shipment, no others will be issued."[74]

---

[71] *See, e.g., Baltic Cotton Co. v. U.S.*, 55 F.2d 568, 569 (holding carrier liable for falsely stating that cargo was in good order) (5th Cir. 1932). *See also Schoenbaum, 1 Admiralty & Mar. Law §10-12 (5th ed.) ("The doctrine of estoppel makes the carrier (or issuer) liable to the consignee for false statements in a bill of lading").*

[72] *See, e.g., Olson Distributing Sys., Inc. v. Glasurit America, Inc.*, 850 F.2d 295, 296 (6th Cir. 1988) (Applying equitable estoppel to case involving unpaid freight charges);

[73] *Glasurit America, Inc.*, 850 F.2d at 296 (*quoting Dickerson v. Colgrove*, 100 U.S. (10 Otto) 578 (1879).

[74] (Ex. 104.)

Because of Freightplus's unequivocally assurances in its letter of indemnity, GIC and its financing institution relied on the representations made in the Freightplus bill to their detriment. Thus, the letter of indemnity, as well as the erroneous bill of lading, render Freightplus liable for the damages arising out of the discrepancies between the Freightplus bill of lading and the bill issued by IMC.

### C.  Freightplus's claims against IMC

Freightplus maintains that it is entitled to indemnity from IMC for any damages it may owe to GIC.[75] As this Court has previously ruled, courts have held ocean carriers liable to indemnify non-vessel operating common carriers (NVOCC's) for acts of negligence leading to loss by the shipper.[76] IMC asserts that Freightplus acted as a freight forwarder rather than an NVOCC, and is thereby not entitled to claim tort indemnity against IMC.[77]

The Court finds that Freightplus acted as an NVOCC. An NVOCC, unlike a freight forwarder, "does not merely arrange for transportation of goods, but takes on the responsibility of delivering the goods."[78] Furthermore, "[i]t is from the bill of lading—the NVOCC's contract with the shipper—that its liability to the shipper for its cargo derives."[79] In contrast, a freight forwarder "is only liable to a shipper for its own negligence . . . ."[80]

---

[75] (Rec. Doc. 93.)
[76] (Rec. Doc. 91 at 8.)
[77] (Rec. Doc. 177 at 30.)
[78] *Scholastic Inc. v M/V KITANO*, 362 F.Supp.2d 449, 455-56 (S.D.N.Y. 2005) (citing *Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir. 2000).
[79] *Id*.
[80] *Id*. (internal quotations omitted).

Looking to Freightplus's bill of lading, the Court finds that Freightplus acted as an NVOCC. The bill of lading names Freightplus as the carrier[81] and specifically provides that Freightplus will be liable for loss or damage to the goods until delivery.[82] Thus, Freightplus took on responsibility for its cargo and thereby acted as an NVOCC, rather than merely arranging for transportation as a freight forwarder. Freightplus's NVOCC status is further buttressed by the fact that Freightplus was paid by GIC alone. In contrast, a freight forwarder receives compensation for its services from both the shipper and from the carrier.[83]  Thus, as an NVOCC, Freightplus may claim indemnity from IMC.

IMC argues that it did not act negligently and therefore cannot be held liable for indemnity. IMC maintains that it was told by Yacht Path that the REBEL's final destination was Warri and therefore fully performed its contractual duties.[84] However, this argument is unsupported. IMC has not produced evidence showing that Yacht Path ordered the REBEL to be shipped to Warri, even though IMC's policies require such documentation to be retained. IMC's head of documentation, James Jackson, testified at his deposition that after discussing an order for shipment with a customer, IMC typically receives bill of lading instructions by email in PDF or Word format and preserves the email pursuant to its email retention policy. IMC then relies on these written instructions to generate its bill of lading.[85] In spite of these procedures, IMC has been unable to locate the bill of lading instructions for the REBEL to verify its claim that Yacht Path asked for shipment to Warri. At the least, IMC's inability to produce its bill of lading

---

[81] The bill defines "carrier" as the "issuer of the Bill of Lading as named on the face of it."
[82] (Ex. 126.)
[83] *Schoenbaum*, §10-7, *quoting In re Black & Geddes, Inc.*, 35 B.R. 830, 832 1984 AMC 451 (Bkrtcy.S.D.N.Y. 1984).
[84] (Rec. Doc. 152 at 13.)
[85] (Rec. Doc. 139012 at 43:10-44:6.)

instructions from Yacht Path or any record of its initial communications with Yacht Path reveals a lack of due care in IMC's booking and record-keeping processes.

Moreover, IMC's agents were alerted to a discrepancy in the REBEL's final destination nearly fourteen days in advance of the INDUSTRIAL DESTINY's arrival in Lagos but failed to act on this information. On January 2, Kyle Branting of Intermarine wrote to Mr. Cummings of Yacht Path to ask whether the REBEL would be discharged at Lagos or Warri. Mr. Cummings replied on January 3 that the REBEL "wants Lagos as discharge."[86] In spite of this exchange, IMC's manifest continued to show Warri as the REBEL's discharge port. Other signs that put IMC on notice of the discrepancy went similarly unheeded. On January 4, the vessel agent wrote in an email that he was under the mistaken impression that Warri would be the vessel's only port of discharge in Nigeria.[87] On January 9, Mr. Cummings again clarified that the REBEL was to be discharged at Lagos.[88] On January 10, Mr. Cummings stated for a third time in an email to several Intermarine employees that the "small tug boat" (referring to the REBEL) was to be delivered to Lagos.[89] Nevertheless, IMC's agent, Intermarine, continued to operate under the impression that the REBEL was to be discharged at Warri.[90] The Court finds that the failure of Intermarine, IMC's agent, to take steps to ensure proper delivery at Lagos in the face of these indications beginning at least two weeks prior to January 17 constitutes negligence on IMC's behalf. Therefore, Freightplus is entitled to claim indemnity from IMC for IMC's negligence in the shipment of the REBEL.

### D.  IMC's Counterclaims

---

[86] (Ex. 19.)
[87] (Ex. 26.)
[88] (Ex. 29.)
[89] (Ex. 31.)
[90] (Ex. 29, Ex. 37.)

Finally, IMC claims a maritime lien against Freightplus, *in personam*, and the REBEL, *in rem*, for freight charges for the carriage of the REBEL, which it claims were never paid.[91] The situation here presents several difficult and novel issues for the Court. Under maritime law, carriers may assert a maritime lien against cargo for unpaid fright.[92] The lien allows the ship-owner to retain the goods carried on its vessel until the freight is paid, or to enforce the lien by a proceeding *in rem* in a district court.[93]

However, the facts presented here raise several additional considerations: First, GIC did in fact pay freight for the REBEL to Freightplus, but that payment was never remitted to IMC.[94] Second, two conflicting bills of ladings were issued in connection with the REBEL's voyage. The bills differ in several key respects, including the REBEL's port of discharge and the terms under which freight for the shipment would be considered earned.[95] Third, GIC was not made aware of the existence of IMC's bill of lading until after the REBEL had discharged in Warri.[96]

In situations similar to the one at hand, where a vessel owner's claim for unpaid freight could result in the shipper's double payment, courts have held that it is the freight forwarder, not the shipper, who must be held liable for the unpaid freight. Indeed, many courts have spoken on this issue such that there is a "well-reasoned consensus" that:

> where a shipper has paid the freight forwarder, and where the carrier issues a Bill of Lading marked 'FREIGHT PREPAID' to the freight forwarder without actually having collected the tariff from the freight forwarder, then the carrier shall be deemed to have

---

[91] (Rec. Doc. 93.)
[92] *The Bird of Paradise*, 72 U.S. 545, 555 (1866).
[93] *Id.*
[94] (Ex. 74.)
[95] (Ex. 126, Ex. 127.)
[96] (Ex. 59.)

unilaterally extended a line of credit to the freight forwarder for the payment of the tariff under the Bill of Lading so marked.[97]

Here, both the IMC and Freightplus bills of lading were marked prepaid, depriving Freightplus of notice that payment of freight had not been made to the vessel.[98] This line of cases suggests that Freightplus (or Yacht Path) should be held liable for the unpaid freight. Although the cses discuss payments made to freight forwarders, the Court finds that the reasoning is not limited to freight forwarders, but applies to NVOCCs as well, which also operate as "middlemen" tasked with remitting payment to the vessel itself.

The Court notes a Fifth Circuit case to the contrary. In *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483 (5th Cir. 1983), the Fifth Circuit held a shipper liable for unpaid freight, though the shipper had in fact paid the freight forwarder, which failed to remit the funds to the carrier. However, the Fifth Circuit based its holding on the language of a conference credit agreement between the freight forwarder and the shipper, which held the shipper absolutely and unconditionally responsible for charges due.[99] Thus, the Court finds this case to be distinguishable, as the parties did not enter an agreement holding the shipper absolutely liable for freight payment.

Moreover, principles of equity push the Court towards holding Freightplus liable for unpaid freight charges. A line of cases acknowledged by the Supreme Court holds that when a carrier falsely represents that a bill of lading has been prepaid, an "innocent party" that has

---

[97] *Compania Sud Americana de Vapores v. Atl. Caribbean Shipping Co.*, 587 F. Supp. 410, 412 (S.D. Fla. 1984), *citing Naviera Mercante S.A. v. Northrup King Co.*, 491 F.Supp. 508 (S.D.Tex.1980); *Inversiones Navieras Imparca, C.A. v. Polysar*, 465 F.Supp. 102 (S.D.Fla.1979); *Farrell Lines, Inc. v. Titan Industrial Corp.*, 306 F.Supp. 1348 (S.D.N.Y.1969), *aff'd* 419 F.2d 835 (2d Cir.1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970). *See also*, *Olson Distributing Sys., Inc. v. Glasurit America, Inc.*, 850 F.2d 295, 296 (6th Cir. 1988); *Inman Freight Sys., Inc. v. Olin Corp.*, 807 F.2d 117, 121 (8th Cir. 1986); *Mediterranean Shipping Co. v. Elof Hansson, Inc.*, 693 F.Supp. 80, 84-85 (S.D.N.Y. 1988).
[98] (Ex. 86, 93.)
[99] *Id.* at 489.

already paid the freight charges shall not be made to suffer "duplication of liability" by being made to pay again.[100] Although the lien here is asserted against the REBEL rather than GIC, courts have acknowledged that the distinction between a party and its property is a technical one. As the Supreme Court has noted, "To say that an owner is not liable, but that his vessel is liable, seems to us like talking in riddles. A man's liability for a demand against him is measured by the property that may be taken from him to satisfy that demand. In the matter of liability, a man and his property cannot be separated.[101] Finding the REBEL liable *in rem* would in effect render GIC liable, which the Court finds is not warranted given that case law on this matter urges courts away from finding a shipper to be liable twice over.

Although Freightplus will also be responsible for paying twice in this situation, unlike GIC, it did not rely on another carrier's bill of lading when operating under the assumption that freight had been prepaid. Instead, the record and testimony indicates that here, Freightplus departed from its custom of forwarding the vessel's bill of lading to the shipper and instead issued its own bill without verifying that freight had been paid to the vessel.

For these reasons, Freightplus is liable to IMC for IMC's unpaid freight.


### E.  Damages

1.  GIC's damages

GIC has shown by a preponderance of evidence that it will cost $55,985.00 to transport the REBEL from Warri to Lagos, and that it will require an additional $5,600 to pay for a

---

[100] *Southern Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 351 (1982), *citing Southern Pacific Transp. Co. v. Campbell Soup Co.*, 455 F.2d 1219 (CA8 1982); *Consolidated Freightways Corp. v. Admiral Corp.*, 442 F.2d 56 (7th Cir. 1971).
[101] *Continental Grain Co. v. Barge FBL-585*, 364 U.S. 19, 24 (1960).

clearing agent for that purpose.[102] GIC has also shown that demurrage and security fees for storage of the REBEL at the port in Warri have accrued at a rate of $1600 per day, and that it will cost $1,534,400 to secure the release of the tug. In addition, GIC has shown that it will have to pay $265,000 for impoundment, overhauling, and national inland waterway fees.[103] Thus, the Court finds that Freightplus is liable to GIC for $1,860,985, as well as prejudgment interest, which is "denied only in extraordinary circumstances" in admiralty cases.[104] Prejudgment interest shall be calculated at a rate of 5% from January 17, 2013 to the date of judgment.

GIC argues that it is entitled to compensation for the lost profits of its parent company. It has submitted into evidence several contracts that its parent company, GIC Oil and Gas, had secured that were contingent on the REBEL's timely delivery to Lagos.[105] GIC also represents that GIC Oil and Gas has authorized GIC to act as its representative in legal proceedings in the U.S.[106] Nevertheless, GIC is not entitled to recover on GIC Oil and Gas's behalf for its lost profits, as it lacks standing to recover for injuries to another.[107]

GIC shall bear the costs of litigation, including attorneys' fees. A prevailing party in an admiralty case is generally not entitled to an award for attorneys' fees.[108]

2. Freightplus's indemnity claim

Freightplus is entitled to be indemnified for 30% of its liability to Freightplus. Freightplus is 70% at fault due to its failure to verify that the information on its bill of lading was

---

[102] (Ex. 65.)
[103] (Ex. 101.)
[104] *Mitsui Marine Fire $ Ins. Co. v. Direct Container Line, Inc.*, 119 F.Supp.2d 412, 417 (S.D.N.Y. 2000).
[105] (Ex. 98, 99, 100.)
[106] (Ex. 102.)
[107] *See, e.g.*, *DeBoer Const., Inc. v. Reliance Ins. Co.*, 540 F.2d 486, 496 (10th Cir. 1976) (Refusing to disregard the separate identities of two subsidiary corporations in order to allow one to recover certain damages on behalf of another.)
[108] *Noritake Co. Inc. v. M/V Hellenic Champion*, 627 F.2d 724, 730-31 (5th Cir. 1980).

accurate, issuing an indemnity letter that contained inaccurate statements, and failing to promptly share information regarding the INDUSTRIAL DESTINY's vessel agent with GIC. IMC is 30% at fault for mistakenly recording the REBEL's port of discharge as Warri and failing to correct the port of discharge when it became known to its agent that the REBEL was actually contracted to discharge at Lagos.

Freightplus is also entitled to collect from IMC 30% of the attorneys' fees spent in defending against GIC's claim. Indemnitees in admiralty are entitled to attorneys' fees on the theory that the indemnitee bore a burden properly belonging to the indemnitor. However, the cost of prosecuting the indemnity claim itself is not recoverable.[109]

3.  IMC's claim

IMC is entitled to recover unpaid freight in the amount of $70,309.12[110], plus prejudgment interest at a rate of 5% from January 17, 2013 to the date of judgment. IMC shall bear the costs of litigating its claim, including attorneys' fees.

## V.  Conclusions

Freightplus is liable to GIC for damages that GIC suffered when the REBEL was shipped to Warri, Nigeria, rather than Lagos, pursuant to an erroneous bill of lading issued by Freightplus. Freightplus is entitled to indemnity from IMC for 30% of GIC's damages. Freightplus is liable to IMC for unpaid freight for the shipment of the REBEL.

---

[109] *SPM Corp. v. M/V/ Ming Moon*, 22 F.3d 523, 525-26 (3d Cir. 1994).
[110] (Ex. 93.)

New Orleans, Louisiana, this 27th day of July, 2015.


UNITED STATES DISTRICT JUDGE